**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JOSEPH HABER and GINA HABER, on behalf of themselves and all others similarly situated, | No. 10 35__ |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| BANK OF AMERICA, N.A. and BAC HOME LOANS SERVICING, L.P., | FILED JUL 19 2010 |
| Defendants. | By _____ Dep. Clerk |

Plaintiffs on behalf of themselves and all others similarly situated, hereby submit the following class action complaint, and upon personal knowledge as to their own acts and status, and upon information and belief as to all other matters, allege as follows against Defendants Bank of America, N.A. and its subsidiary BAC Home Loans Servicing, L.P. (hereinafter collectively "Bank of America" or "Defendants"):

## NATURE OF THE ACTION

1. The United States is in the midst of an unprecedented foreclosure crisis. Almost 3.1 million homes have been seized by lenders since April 2005.[1]

2. The crisis does not appear to be improving. May 2010 represented the second consecutive month in which foreclosures on U.S. homes reached a record rate.[2]

---

[1] http://www.businessweek.com/news/2010-06-10/u-s-home-foreclosures-climb-44-to-record-in-may-update1-.html
[2] *Id.*

3. In February 2009, the federal government instituted the Home Affordable Modification Program ("HAMP") as part of an effort to help mortgage loan borrowers ("Borrowers") save their homes and thereby slow the tide of foreclosures.

4. HAMP contains a number of measures to aid Borrowers, but its primary purpose is to insure that qualified Borrowers receive mortgage loan modifications designed to help them keep their homes.

5. Participation in HAMP is mandatory for banks which accepted federal money under the now-famous Troubled Asset Relief Program ("TARP"), 12 U.S.C. § 5211.

6. Defendant Bank of America has accepted at least $25 billion in funds under TARP and, as it therefore must, has agreed to participate in HAMP.

7. Under HAMP, Bank of America is obligated to identify Borrowers, whose loans it services, that would benefit from loan modifications. Such identification is to be based on Bank of America's own investigation, as well as requests from Borrowers themselves.

8. Once eligible Borrowers are identified, HAMP requires that Bank of America perform an analysis of a Borrower's financial situation and, if it meets HAMP guidelines, offer the Borrower a Trial Period Plan ("Trial Plan").

9. Under the Trial Plan, Borrowers are required to make three trial payments ("Trial Payments") at a modified loan rate.

10. If Borrowers successfully make the Trial Payments, then HAMP requires and Bank of America, in fact, promises Borrowers that they will be approved for a permanent loan modification under HAMP.

11. Instead of complying with the aforementioned requirements of HAMP and its own agreements with Borrowers, Bank of America has failed to give permanent loan modifications to Borrowers who have satisfied the requirements of the Trial Plan by making their Trial Payments.

12. Instead, Bank of America has denied permanent loan modifications to Borrowers who are entitled to them under both HAMP and Bank of America's own agreements with Borrowers.

13. As detailed herein, Bank of America has significant financial incentives to deny Borrower's HAMP loan modifications and is actively engaged in pursuing these incentives, contrary to its obligations to the U.S. government and Borrowers.

14. Bank of America's wrongdoing extends far beyond its improper denials of HAMP modifications, however. Bank of America, among other actions, has also engaged in the following conduct, which is prohibited by HAMP and other laws:

    a. Instructing Borrowers that are current, or less than 60 days delinquent, in their mortgage payments that they cannot be evaluated for the HAMP modification until they become 60 days delinquent;

    b. Failing to timely evaluate Borrowers for HAMP eligibility;

    c. Failing to offer Trial Plans to eligible Borrowers;

    d. Assessing improper fees against Borrowers participating in HAMP;

    e. Allowing Borrowers to remain on Trial Plans for longer than the mandated three months before issuing them an improper denial of permanent HAMP modification; and

  f. Following its improper denials of HAMP modifications, Bank of America immediately demands balloon payments from Borrowers to cover the difference between Trial Payments and the Borrowers' standard monthly mortgage payments.

 15. As a result, Plaintiffs bring this lawsuit against Bank of America on behalf of themselves and all other similarly situated Borrowers, alleging claims for breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, unjust enrichment, and violations of Pennsylvania's consumer protection law.

 16. Indeed, Pennsylvania Borrowers are not alone in taking legal action against Bank of America, as class action suits have been filed on behalf of Borrowers in Washington, California, and Arizona. *See, e.g., Kahlo v. Bank of America, et al.*, No. 2:10-cv-488 (W.D. Wash.).

## JURISDICTION AND VENUE

 17. This Court has subject matter jurisdiction pursuant to 28 U.S.C. 1332(d)(2), since there are at least 100 class members in the proposed class, the combined claims of proposed class members exceed $5,000,000 exclusive of interest and costs, and there are numerous class members who are citizens of states other than Bank of America's state of citizenship, which is Delaware.

 18. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367 because the Plaintiffs are intended, third-party beneficiaries to a contract between Bank of America and the U.S. Treasury Department that was executed pursuant to TARP.

19. This Court has personal jurisdiction over Bank of America because a substantial portion of the wrongdoing alleged in this Complaint took place in this District, Bank of America is authorized to do business in this District, Bank of America has sufficient minimum contacts with this District, and/or Bank of America intentionally avails itself of markets in this District through the promotion, marketing and sale of its products and services to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

20. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because the named Plaintiffs reside here, because Bank of America has hundreds, if not thousands, of customers in this District, because Bank of America receives substantial fees from Borrowers in this District, because Bank of America maintains offices and branch banks in this District, and because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

21. Plaintiffs Joseph and Gina Haber are married, over 18 years of age, and reside in Warminster, Pennsylvania.

22. Defendant Bank of America, N.A. is a national banking association, headquartered in Charlotte, North Carolina.

23. Defendant BAC Home Loans Servicing, LP is a subsidiary of Bank of America, N.A., and is headquartered in Calabasas, California.

## GENERAL FACTUAL ALLEGATIONS

### I. FORECLOSURES IN PENNSYLVANIA

24. Pennsylvania has not been immune to the foreclosure problems being experienced by the rest of the United States.

25. The Associated Press reported on June 10, 2010, that "the number of Pennsylvania homes entering the foreclosure process over the past 12 months rose by more than 20 percent, despite a national rate that stayed flat over the same period. New figures out Thursday from foreclosure listing firm RealtyTrac Inc. showed almost 5,300 Pennsylvania homes received at least one foreclosure filing in May."[3]

26. The same report also noted that "Pennsylvania's foreclosure rate in May was two-fifths the national rate, with approximately one in every 1,000 homes receiving a foreclosure filing last month. A year ago, the state's foreclosure rate was one-third the national rate, a sign that Pennsylvania's situation worsened while the nation's foreclosure crisis appeared to level off."[4]

27. HAMP's most recent report on the performance of its participant loan servicers, current through April 2010, shows that between 5-10% of mortgage loans in Pennsylvania are at least 60 days delinquent.

### II. THE HOME AFFORDABLE MODIFICATION PROGRAM ("HAMP")

28. HAMP is one of two programs which make up the federal Making Home Affordable program ("MHA").[5]

---

[3] http://www.pennlive.com/midstate/index.ssf/2010/06/pennsylvania_foreclosure_rate.htm.
[4] *Id.*
[5] The other MHA program is the Home Affordable Refinance Program, which is not relevant to this Complaint.

29. The creation of MHA was announced by the Treasury Department on February 18, 2009, pursuant to authority granted the Secretary of Treasury under the Emergency Economic Stabilization Act of 2008, 12 U.S.C.A. § 5201 *et seq.*, as amended by the American Recovery and Reinvestment Act of 2009.

30. HAMP is funded in large part by monies allocated from the Troubled Asset Relief Program ("TARP").

31. The intent of HAMP is that loan servicers and lenders, such as Bank of America, will identify those of their Borrowers who might benefit from the Program and then take the steps set forth below to achieve loan modifications for this identified group.

### A. A Loan Servicer's Duties Under HAMP

#### i. The Servicer Participation Agreement

32. A loan servicer's participation in HAMP is documented by a Servicer Participation Agreement ("SPA"), which is a contract between the servicer and the Federal National Mortgage Association ("Fannie Mae"), as financial agent of the United States.

33. On or about April 17, 2009, Bank of America entered into an SPA ("Bank of America SPA") with Fannie Mae, attached hereto as Exhibit A.

34. Pursuant to the Bank of America SPA, a HAMP "Participating Servicer" ("Participating Servicer") agrees to comply with all "Program Guidelines," as set forth in the "Program Documentation ("Program Documentation")." Exhibit A, Bank of America SPA, I(A), p. 2.

35. The SPA defines the "Program Documentation" as "any supplemental documentation, instructions, bulletins, letters, directives, or other communications,

including but not limited to, business continuity requirements, compliance requirements, performance requirements and related remedies, issued by the Treasury, Fannie Mae, or Freddie Mac in order to change, or further describe or clarify the scope of, the rights and duties of the Participating Servicers in connection with the Program." Exhibit A, Bank of America SPA, I(A), p. 2.

36. According to the SPA, Program Documentation also includes "Supplemental Directives" ("Supplemental Directives"). Exhibit A, Bank of America SPA, I(A), p. 2.

### ii. The Purpose of HAMP: To Benefit Borrowers

37. On April 6, 2009 the United States Department of the Treasury ("Treasury") issued its first Supplemental Directive, which states that HAMP is "aimed at helping 3 to 4 million at-risk homeowners – both those who are in default and those who are at imminent risk of default – by reducing monthly payments to sustainable levels." Supplemental Directive 09-01, p. 1, attached hereto as Exhibit B.

38. Under the Program Documentation, Bank of America is required to evaluate all of its mortgage loans to determine whether they are eligible for HAMP. Exhibit B, Supplemental Directive 09-01, p. 4.

39. In addition, Bank of America is required to evaluate Borrowers for HAMP if such Borrowers contact Bank of America seeking a loan modification and are at risk of "imminent default" – a condition which must be evaluated by Bank of America. Exhibit B, Supplemental Directive 09-01, pp. 3-4.

### iii. HAMP Eligibility and Loan Modification

40. Supplemental Directive 09-01 sets forth the eligibility criteria for HAMP, which include, among other requirements, that the loan be a first lien mortgage and that the Borrower's monthly mortgage payment is "greater than 31 percent" of the Borrower's monthly income. Exhibit B, Supplemental Directive 09-01, pp. 2-3. In addition to the other requirements, HAMP requires that a loan be either delinquent or that default on the loan is "reasonably foreseeable." *Id.* at p. 2. Loans in foreclosure are eligible for HAMP. *Id.*

41. If a Borrower is found to be HAMP-eligible, a series of steps must be taken by the Participating Servicer to reduce the Borrower's mortgage payment to 31% or less of the Borrower's monthly income (the "Modified Payment"). Exhibit B, Supplemental Directive 09-01, pp. 8-10.

### iv. The Trial Period Plan

42. Once a Modified Payment is established for a Borrower, HAMP mandates that a Borrower then be placed on a Trial Period Plan ("Trial Plan"). Exhibit B, Supplemental Directive 09-01, pp. 17-18.

43. The Trial Plan requires the Borrower to make three consecutive Modified Payments, which are known as Trial Payments ("Trial Payments"). Exhibit B, Supplemental Directive 09-01, p. 17.

44. The purpose of the Trial Plan is presumably to demonstrate the Borrower's ability to make Modified Payments.

### v. Successful Completion of the Trial Plan Should Result in a Permanent Modification Under HAMP

45. If a Borrower makes the three Trial Payments, HAMP mandates that the Borrower be given a permanent modification ("Permanent Modification"). Exhibit B, Supplemental Directive 09-01, p. 18; *see also* Exhibit C, HAMP Sample Offer Document for Servicers; Exhibit D, Bank of America HAMP Offer Sheet.

46. The Permanent Modification is fixed for five years in the amount of the Modified Payment. Exhibit B, Supplemental Directive 09-01, pp. 8-10.

### vi. Additional Requirements and Prohibitions Under HAMP

47. In addition to the aforementioned requirements of HAMP, the program also imposes the following obligations, among others, on Participating Servicers:

   a. A Borrower may not be reported to credit reporting agencies without explanation while participating in HAMP (Exhibit B, Supplemental Directive 09-01, p. 22);

   b. "Servicers must have adequate staffing, resources, and facilities for receiving and processing the HAMP documents and any requested information that is submitted by borrowers. Servicers must also have procedures and systems in place to be able to respond to inquiries and complaints about the HAMP. Servicers should ensure that such inquiries and complaints are provided fair consideration, and timely and appropriate responses and resolution." (Exhibit B, Supplemental Directive 09-01, p. 13); and

    c. A Borrower cannot be asked for a "good faith" payment prior to being placed on a Trial Plan. HAMP Supplemental Documentation dated January 8, 2010, at Q.83.[6]

## III. <u>BANK OF AMERICA'S VIOLATIONS OF HAMP</u>

48. Bank of America has been systematically violating HAMP in at least the following ways:

    a. Denying Permanent Modifications to Borrowers who successfully comply with and complete Trial Plans;

    b. Imposing balloon payments on Borrowers who were improperly denied Permanent Modifications;

    c. Keeping Borrowers on Trial Plans far longer than three months;

    d. Instructing Borrowers that are current, or less than 60 days delinquent, in their mortgage payments that they cannot be evaluated for the HAMP modification until they become 60 days delinquent;

    e. Failing to adequately assess its loan portfolio to identify Borrowers who might be eligible for HAMP;

    f. Failing to respond in timely fashion to Borrowers who request loan modifications;

    g. Improperly reporting HAMP participants to credit reporting agencies;

    h. Proceeding with foreclosure actions against HAMP participants;

    i. Failing to maintain adequate staff to administrate HAMP;

    j. Charging improper fees and penalties to HAMP participants;

---

[6] https://www.hmpadmin.com/portal/programs/hamp/servicer.html.

      k. Demanding up-front payments from Borrowers before placing them in Trial Plans.

49. Bank of America's violations of HAMP are legion and, in many cases, deliberate. Bank of America's method of dealing with HAMP participants and would-be participants is to route them through endless phone calls with customer service representatives who give conflicting answers, are ignorant of the details of HAMP, and frequently attempt to bully Borrowers into making decisions which are not in their best interests and contrary to HAMP.

50. Bank of America's conduct constitutes a breach of its SPA with the federal government, a contract to which Plaintiffs and the Class are third-party beneficiaries.

## IV. BANK OF AMERICA HAS CONTRACTED DIRECTLY WITH PLAINTIFFS AND THE CLASS

51. Bank of America, irrespective of HAMP, has made an offer to Plaintiffs and the Class to enter into a contract.

52. Bank of America sends an offer sheet ("Offer Sheet") to potential HAMP participants. A copy of an Offer Sheet is attached hereto as Exhibit D.

53. The Offer Sheet sets forth the terms of Bank of America's agreement with Plaintiff and the Class.

54. Specifically, the Offer Sheet states:

      a. You provide us with information to confirm your financial situation.

      b. We will review the information you provide and determine if you are eligible for the Home Affordable Modification Program.

    c. If the eligibility requirements are met, you will be offered a new affordable mortgage payment for a 3 month trial period.

    d. After the trial period is successfully completed, a new loan modification agreement will be sent to you.

Exhibit D, Offer Sheet.

55. The terms of Bank of America's Offer Sheet have been accepted by Plaintiffs and the Class in the following ways by: (1) signing a Trial Plan agreement (a sample of which is attached hereto as Exhibit E); (2) submitting documentation requested by the Offer Sheet; and/or (3) submitting Trial Payments.

56. Thus, Bank of America's Offer Sheet and the acceptance thereof by Plaintiffs and the Class have formed an enforceable contract between the parties.

## VI. BANK OF AMERICA'S WRONGFUL DENIAL OF PLAINTIFFS' HAMP MODIFICATION

57. Plaintiffs Joseph and Gina Haber bought their home in 2005, taking a mortgage loan ("Mortgage") through Countrywide Financial.

58. When Bank of America acquired Countrywide Financial, Bank of America became the servicer of Plaintiffs' Mortgage.

59. The monthly payments on the Mortgage were $2,276.94.

60. In or around March 2009, Plaintiffs became concerned that they might become delinquent on their mortgage due to several factors, including that one of their children had become ill with a condition requiring expensive medicines that were not entirely covered by insurance.

61. Plaintiffs contacted Bank of America by phone in order to seek a modification of their Mortgage.

62. During this phone call, a Bank of America representative told Plaintiffs that they could not be considered for a HAMP modification until they were 60 days delinquent on their Mortgage. The Bank of America representative further advised Plaintiffs to withhold Mortgage payments in order to reach this level of delinquency.

63. In reliance on the advice given by the Bank of America representative, Plaintiffs held the Mortgage payments they were capable of making until their Mortgage was 60 days delinquent. At this point, Plaintiffs contacted Bank of America again and requested a mortgage loan modification.

64. In response to this call, Bank of America sent Plaintiffs the HAMP Offer Sheet attached as Exhibit D hereto.

65. Plaintiffs complied with all documentation requested by Bank of America with respect to their HAMP application.

66. Plaintiffs were issued a Trial Plan agreement by Bank of America, attached hereto as Exhibit E, which set a starting date for the Trial Plan of June 12, 2009.

67. Plaintiffs executed the Trial Plan agreement (Exhibit E)[7] and proceeded to make timely Trial Payments of $1,832.12 beginning in June 2009.

68. After completing three months on the Trial Plan, Plaintiffs called Bank of America to ask when they would receive their Permanent Modification. A Bank of America representative replied that Plaintiffs would receive the Permanent Modification soon.

---

[7] The signature pages of the Trial Plan agreement, attached as Exhibit E, is missing because Plaintiffs sent their original, executed signature pages to Bank of America but did not retain copies. These original signature pages are in Bank of America's possession and Bank of America's receipt of the signature pages is reflected by its issuance of a Trial Plan to Plaintiffs.

14